UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| MACK ENERGY CO. | * | CIVIL ACTION NO. 16-1696 |
| --- | --- | --- |
| | * | |
| | * | SECTION: "E"(1) |
| VERSUS | * | |
| | * | JUDGE SUSIE MORGAN |
| | * | |
| RED STICK ENERGY, L.L.C., ET AL. | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

Before the Court is the Motion to Compel filed by Mack Energy Co. (Rec. Doc. 177). Oral argument was held on July 24, 2019, and several objections were resolved. The court took under submission the remaining issues concerning whether discovery into the alter ego and corporate veil piercing claims would be allowed. For the following reasons, as to the remaining issues, the Motion is GRANTED.

Background

This lawsuit arises out of a contract to acquire and develop an exploratory drilling prospect off the coast of Plaquemines Parish ("Main Pass 21 Prospect"). Houston Energy, L.P. ("Houston Energy"), acquired seismic data covering the Main Pass 21 Prospect, acquired a lease covering the lands in the Main Pass 21 Prospect, and contacted various parties to participate in the prospect. Mack Energy Co. ("Mack") says it was recruited to participate as the operator under a participation agreement ("PA") and a joint operating agreement ("JOA"). Under the PA, all of the parties agreed to bear their proportionate share of the cost to acquire the lease and the seismic data, to develop the prospect, and to drill the initial test well. As operator, Mack was responsible to drill the initial well, including paying the costs thereof, which it would invoice to the parties in their proportionate share. Mack claims that when it was first approached by Houston Energy, there was still a 26.5%

1

interest available and that Mack was unwilling to agree to act as operator until that remaining interest was purchased and Mack was satisfied that the purchaser would have sufficient funds to pay their share of the costs. Mack says that Houston Energy represented that Thomas Burnett and Albert W. Gunther, Jr. where interested buyers, had previously participated with Houston Energy in a prospect named Barber's Hill, and that they had timely paid their share of their costs for the Barber's Hill Prospect.

Citing a December 3, 2015, email,[1] Mack alleges that Gunther, Jr., and Burnett agreed to acquire a 26.5% interest in the Main Pass 21 Prospect. In that email, Burnett writes that he and Gunther, Jr., "have decided to participate in another oil & gas deal together. The test well will spud in December, 2015. Therefore, as soon as possible, we will need to set-up another property specific LLC (MP 21, LLC?) and bank account in identical fashion to the manner in which we set-up the Barber's Hill, LLC." (Rec. Doc. 191-1). The email is addressed to individuals that Mack describes as Gunther, Jr.'s authorized agents or representatives: Gunther, III; Jill Cxapla, Marshall Hebert, and Donna Begovich. In response, Jill wrote "Bill [Gunther, Jr.] and I discussed setting up the company so I will move forward right away." Id.

Mack says that Houston Energy and/or Burnett informed it that Burnett and Gunther, Jr., had agreed to buy the 26.5% interest through an entity to be formed in the future and that the entity would be funded 90% by Gunther, Jr., and 10% by Burnett through his company Red Stick Energy, L.L.C. ("Red Stick"). Due to time constraints and deadlines, Mack says it agreed to allow Red Stick to execute the PA and JOA as buyer of the full 26.5% interest with the understanding that pursuant to an agreement between Red Stick and Gunther, Jr., the 26.5% interest would be assigned to Main Pass 21, LLC ("Main Pass"), the new entity that had not yet been formed. Mack says that

---

[1] It appears this email was obtained by Mack in discovery.

2

attached to the executed PA is an Authority for Expenditures ("AFE") estimating the cost of a completed initial test well to be $4,924,795. According to Mack, by executing the PA, Red Stick agreed to pay $109,285.25 to Houston Energy, an initial payment of $830,602.75 towards the cost of drilling the initial test well, and 26.5% of any additional costs incurred to drill and test the initial well and either completing it for production or plugging and abandoning it if it was a dry hole.

Mack says that it believes Main Pass was formed on December 16, 2015, six days before the PA and JOA were executed by Red Stick. Mack says that Main Pass paid it $830,602.75 by wire transfer on December 23, 2015, and that Main Pass paid Houston Energy $109,285.52 by check on January 4, 2016, all pursuant to the PA. Mack asserts on information and belief that the two payments were made from Gunther, Jr.'s personal funds "using Main Pass as a shell to shield Gunther, Jr., from liability under the PA and JOA." According to the defendants, they have produced documents showing that Main Pass was funded by its members, Red Stick and Natrona Resources, LLC.

Mack proceeded to drill a test well, which was plugged and abandoned as a dry hole. Mack says the actual cost was less than estimated. It says it invoiced Red Stick for its share of the costs because the assignment from Red Stick to Main Pass had not yet been completed. Mack says a portion of Red Stick's shares of the costs have been paid late and a portion has not been paid at all. Mack sent a written demand to Red Stick on June 20, 2016. Red Stick paid $31,699.93, which corresponds with 10% of Red Stick's share of costs. Mack says that it was informed by Burnett that pursuant to the agreement between him and Gunther, Jr., Red Stick is only responsible for 10% because Red Stick would assign its interest to Main Pass. It was also told that pursuant to the same agreement, Gunther, Jr., is responsible for funding 90% of Main Pass.

Mack filed this lawsuit in the Western District of Louisiana on December 8, 2016, against Red Stick, Burnett, and Main Pass, seeking to compel arbitration of the payment dispute. Mack amended its complaint in February 2017, joining Dixie Management Services LLC ("Dixie") as a defendant and alleging that Dixie Management Services, LLC, was a member of Main Pass. In September 2018, Red Stick and Burnett filed a cross-claim against Main Pass, Dixie and Gunther, Jr. At the same time, Red Stick and Burnett joined Natrona Resources, LLC ("Natrona"), RE Trust[2] ("RE Trust"), Old South Mechanical LLC ("OSM"), Old South Ventures LLC ("OSV" and with Natrona, RE Trust, OSM, and Dixie, the "Gunther Entities"), and Albert W. Gunther, III ("Gunther, III") as third-party defendants. In these two pleadings, Red Stick alleges that the Gunther Entities have breached their agreement to accept assignment of 90% of the ownership interest in Main Pass and to be responsible for 90% of the drilling costs related to the project. Alternatively, it asserts a claim for detrimental reliance. Red Stick also alleges that Gunther, Jr., and the Gunther Entities improperly used the Gunther Entities and Main Pass to perpetrate a fraud on Red Stick by promising that Main Pass would purchase Red Stick's interests in the Main Pass 21 Prospect without the intent to follow through in the event that the well was a dry hole. It alleges that the Gunther Entities are so unified with each other that their misuse of the corporate form requires that the corporate veil should be pierced and the corporate form should be disregarded. Red Stick alleges that the Gunther Entities have common ownership and management and that they comingle property and assets. Red Stick alleged that the members of Main Pass are Red Stick and Natrona; that the members of Natrona are believed to be RE Trust and/or OSM and/or Gunther, Jr.; that the sole member or trustee of RE Trust is believed to be Gunther Jr.; that OSM's members are believed to be OSV and/or Gunther, Jr., and/or Dixie; that OSV is believed to be the manager

---

[2] Eventually Red Stick substituted Gunther, Jr., and Martha Gunther as trustees of the RE Trust in place of RE Trust.

of OSM; that OSV's members are believed to include Gunther, Jr., Gunther, III, and Kenneth Keeling and that these three are believed to be the managers of OSV; and that Dixie's sole member and manager is believed to be Gunther, Jr.

Also, in September 2018, Mack amended its complaint, joining Natrona, RE Trust, OSM, OSV, and Gunther, III, as defendants. After the filing of a motion to dismiss by Gunther, Jr., Gunther, III, and the Gunther Entities and a status conference held by the district court regarding the motion, on May 2019, Mack moved to voluntarily dismiss its breach of contract and piercing the corporate veil claims. Mack also filed an amended complaint naming only Red Stick, Main Pass, and Gunther, Jr., as defendants. The present complaint is Mack's Fifth Superseding and Amended Complaint, filed on June 18, 2019. Mack asserts a claim for breach of the PA and JOA against Red Stick, it asserts a claim for detrimental reliance against Gunther, Jr., and it claims that "Main Pass assumed the obligations of Red Stick under the PA and JOA."

On June 4, 2019, Gunther, Jr., named Houston Energy as a third-party defendant, alleging that Houston Energy was not authorized to make any representations on behalf of Gunther, Jr., personally. Houston Energy has not yet filed responsive pleadings.

Of some interest to the relevance issues raised by the present motion to compel is the fact that Mack has entered into a settlement agreement with Red Stick, Burnett, and Janet Burnett pursuant to which Red Stick and the Burnetts have (1) assigned to Mack their rights against the Gunther Parties, (2) paid Mack $25,000, and (3) agreed not to contest a future motion for summary judgment filed by Mack against Red Stick. Mack has agreed (1) to release all claims against the Burnetts, (2) not to execute any judgment against Red Stick and the Burnetts, and (3) to pay the attorneys' fees of Red Stick and Burnett in this litigation.

Mack filed the present motion to compel against Gunther, Jr., Gunther III, and the Gunther Entities (the "Gunther Parties"). Some of the issues raised were resolved in open court at oral argument on July 24, 2019. The court took under submission the issues raised by Mack's requests for discovery into the alter-ego/corporate veil piercing claim. Among other things, Mack seeks information about the ownership of Main Pass and the Gunther Entities, it seeks information about the funding and transfers to Main Pass and to the Barber's Hill prospect, it seeks information about the assets, liabilities, income sources, and net worth of Main Pass, it seeks the bank statements of Main Pass, Natrona, Dixie, and Gunther, Jr., it seeks tax returns for Main Pass, Gunther, Jr., and the Gunther Entities, it seeks formation documents for the Gunther Entities, and it seeks information about any transfers, loans, or guarantees made to or by Gunther, Jr., Gunther, III, Main Pass, and the Gunther Entities.

Law and Analysis

1. *Scope of Discovery*

The Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). Of note, with the 2015 amendment to Rule 26, it is now clear that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Id.

While construing relevance broadly, this Court is anchored by the parties' pleadings. See Fed. R. Civ. Proc. 26 advisory committee's notes to 2000 amendment (explaining that in analyzing relevance, the parties should "focus on the actual claims and defenses involved in the action," but that "a variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action"); see also XTO Energy, Inc. v. ATD, LLC, No.

CIV 14-1021 JB/SCY, 2016 WL 1730171, at *17 (D.N.M. Apr. 1, 2016) (quoting State Farm Mut. Auto. Ins. Co. v. Fayda, No. 14CIV9792WHPJCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015), aff'd, No. 14CV9792, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016)) (concluding that following the 2015 amendments to the Rules, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense.'"). Thus, "[t]o implement the rule that discovery must be relevant to the claim or defense of any party, district courts have examined the relationship of the requested discovery and the facts it is intended to uncover to the specific claims and defenses raised by the parties." Thibault v. BellSouth Telecommunications, Inc., No. CIV.A. 07-200, 2008 WL 4808893, at *2 (E.D. La. Oct. 30, 2008) (M.J. Wilkinson). Indeed, the advisory committee's notes to Rule 26 explain that the parties "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings" and the court "has the authority to confine discovery to the claims and defenses asserted in the pleadings." Fed. R. Civ. P. 26 advisory committee's 2000 Amendment notes.

In addition to being relevant, discovery must be proportional. In determining proportionality, the parties (and the Court if called to weigh in) should consider:

> the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. Proc. 26(b)(1). The advisory committee comments to the 2015 amendment to Rule 26 make clear that the parties and the court have a collective responsibility to ensure that discovery is proportional. The party claiming it would suffer an undue burden or expense is typically in the best position to explain why, while the party claiming the information sought is important to resolve the issues in the case should be able "to explain the ways in which the underlying

7

information bears on the issues as that party understands them." Id. advisory committee's note to 2015 amendment. "The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." Id.

   2. *Alter Ego and Piercing the Corporate Veil*

Apparently, the parties agree that Texas law applies to Red Stick's corporate veil and alter ego arguments against Gunther, Jr., Main Pass, Dixie, OSM, RE Trust, and OSM, while Louisiana law applies to OSV and Gunther, III.

"The fundamental concept of corporate law is that the corporation is a wholly separate, legal entity. As such, the corporation, and not its shareholders, is liable for its own debts and torts." W. Horizontal Drilling, Inc. v. Jonnet Energy Corp., 11 F.3d 65, 67 (5th Cir. 1994). Under Texas law, a court may pierce the corporate veil when "(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." Id. To determine whether a corporation is an alter ego of its owners, the court considers the total dealings of the corporation, including "the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes."[3] Id. at 68 (quoting Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986)). Courts will consider the following evidence as proof of an alter ego:

> (1) the payment of alleged corporate debts with personal checks or other commingling of funds, (2) representations that the individual will financially back the corporation, (3) the diversion of company profits to the individual for the individual's personal use, (4) inadequate capitalization, and (5) any other failure to keep corporate and personal assets separate.

---

[3] The Fifth Circuit in Horizontal Drilling observed that although Castleberry also listed the failure to follow corporate formalities as a factor, that factor was subsequently overruled by Texas statute. 11 F.3d at 68.

Dodd v. Savino, 426 S.W.3d 275, 291 (Tex. App. 2014).

Under Louisiana law, the corporate form may also be disregarded when the corporation is simply the "alter ego" of the shareholder. Riggins v. Dixie Shoring Co., 590 So. 2d 1164, 1168 (La. 1991). As in Texas, a totality of the circumstances is considered. Id. at 1169. Courts consider, among other things,

> 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings.

Id. at 1168. Typically, an "alter ego" situation involves fraud or deceit by the owner acting through the corporation. Id.

3. *Mack's Discovery*

In their opposition, defendants argue that Mack should not be allowed to conduct discovery into claims of alter ego or corporate veil piercing because Mack's claims on those grounds have been dismissed. They point out that they have produced documents showing that Main Pass was properly funded by its members.

Mack responds that Red Stick's alter ego and corporate veil piercing claims against Main Pass, Gunther, Jr., Gunther, III, and the Gunther Entities remain live. Mack argues that it has a clear interest in the outcome of Red Stick's corporate veil and alter ego claims and submits that Rule 26 allows discovery into any non-privileged matter relevant to "*any* party's claim or defense." It adds that Red Stick will simply propound the same discovery if Mack is not allowed to obtain the discovery now.

Mack argues that Red Stick has alleged almost all of the factors considered by Louisiana and Texas courts in piercing the corporate veil. It insists it must be allowed to conduct the requested

9

discovery into the veil-piercing factors in order to establish its claims because the defendants are the sole possessors of the requested information.

At oral argument, counsel for the Gunther Parties argued that there is no basis for the alter ego claim and that Mack's discovery is merely a fishing expedition. Counsel represented that in a Rule 37 discovery conference with Red Stick, he was informed that Red Stick had no evidence to support its alter ego claim. Counsel asserted that he intends to file a motion for summary judgment on this basis. Counsel for Mack asserted that he understood from Red Stick's counsel that while there may not be any documents proving alter ego, there is testimonial evidence to support the claim. Although an attorney for Red Stick was present at the hearing, he was not the attorney who participated in the Rule 37 conference and did not speak to Red Stick's position on the existence of evidence to support the alter ego/veil piercing claim.

Mack responded that they have sufficient evidence and allegations to meet the threshold to conduct discovery into the alter ego claims. Mack pointed to the December 3, 2015, email indicating that Gunther, Jr., and Burnett had agreed to participate in the Main Pass 21 Prospect on the same terms as they had participated in the Barber's Hill prospect. There is evidence that funding was provided until the Main Pass 21 Prospect was determined to be a dry hole. Mack's counsel added that Gunther, Jr., does not conduct any business by email and, accordingly, evidence of what happened will be testimonial and not documentary. Mack pointed out that the documents they need to prove alter ego are in the possession of the defendants and it will further oppose any motion for summary judgment on the grounds that it needs additional time to conduct discovery and obtain the documents in support of its claims. Mack argued that while Gunther, Jr., does not appear to be a member of any of the entities making up the Gunther Entities, this leaves open the question of the December 3, 2015 email indicating Gunther, Jr.'s role in forming Main Pass.

10

At oral argument the Gunther Parties requested that if the court was inclined to allow discovery into the alter ego theory, it should do so only pursuant to a protective order limiting dissemination of the documents. They said they preferred that a neutral third-party review the documents because they want their financial information to remain private. They offered no more specific reason why the documents could not be disclosed to Mack or the other parties in this case. They also requested that the veil piercing discovery be conducted in a staggered fashion, arguing that Red Stick must first prove that it can pierce the corporate veil of Main Pass before it can proceed to conduct discovery into ownership and financial information of Natrona, and so on down the line. They further requested that any order requiring production be stayed pending the district court's ruling on their forthcoming motion for summary judgment. The Gunther Parties did not raise any issues concerning the volume of production or the financial burden of producing the requested documents.

The court finds that discovery into the alter ego and corporate veil piercing theories is appropriate at this time. While in some cases a threshold showing may be required before discovery into an alter ego theory is allowed, Mack and Red Stick are not required to prove their case prior to conducting discovery into their theory of relief. Here, the alter ego claims are not based on the pleadings alone. In addition to the allegations of wrongdoing in Red Stick's third-party complaint and cross claim, the December 3, 2015, email indicates Gunther, Jr.'s agreement to participate in the Main Pass 21 Prospect. There appears to be no dispute that Main Pass (and not Red Stick—the signatory to the PA and JOA) paid almost $1 million in satisfaction of obligations under the PA/JOA. According to Main Pass and the Gunther Parties, the evidence shows that Main Pass was funded by Natrona and Red Stick. The court finds the allegations and evidence available at this time are sufficient to justify proceeding with the alter ego and corporate veil piercing discovery.

Mack pointed to the December 3, 2015, email indicating that Gunther, Jr., and Burnett had agreed to participate in the Main Pass 21 Prospect on the same terms as they had participated in the Barber's Hill prospect. There is evidence that funding was provided until the Main Pass 21 Prospect was determined to be a dry hole.

Mack seeks the following information: 1) identification of the owners of each of the Gunther Parties, their proportionate share of ownership, the consideration paid, and the date each interest was acquired, as well as all documents related to the ownership interest or financial or business relationship with such party; 2) as to each of the Gunther Parties except Main Pass, whether the party directly or indirectly funded Main Pass or Barber's Hill, LLC; 3) identification of all assets, liabilities, sources of income, and net worth of Main Pass; 4) whether any of the Gunther Entities directly or indirectly funded Main Pass and if so, all documents pertaining thereto; 5) bank statements of Main Pass from date of opening through end of March 2019 (only December 2015 and January 2016 have been produced) and bank statements of Natrona, Dixie, and Gunther, Jr. from June 2015 through the end of March 2019; 6) 2015 through 2018 federal tax returns for Gunther, Jr., and the Gunther Entities; 7) formation documents for OSV, OSM, RE Trust, Natrona, and Dixie (those of Main Pass have already been produced); 8) and identification and description of any transfers or loans between any of the Gunther Parties and any guarantees or cosigns of any obligations of the Gunther Parties along with any documents evidencing such loans. The court finds that each of these categories seeks information that is relevant to the alter ego claims. Only one is overbroad—the request for "all documents" related to ownership interests or financial or business relationships in category 1. That request will be narrowed to documents reflecting (a) the

owner's investments and (b) any funds transferred between the owner and the entity. The remainder are sufficiently tailored as written. These requests bear on the issues of comingling of assets, capitalization, and diversion of funds, which are part of the alter ego analysis under Texas and Louisiana law. As to Barber's Hill, in light of the December 3, 2015, email indicating that Gunther, Jr., and Burnett agreed to set up Main Pass in the same way they had set up Barber's Hill, information regarding the funding of Barber's Hill is relevant.

Further, the court finds the information is proportional with the needs of the case. The requested information is important to uncovering evidence to support the alter ego claim. As Mack points out, this information is only obtainable from the defendants. Notably, the only concerns raised by the Gunther Parties were privacy, and not the cost or burden of production. As to the Gunther Parties' privacy concerns, the court finds that a protective order limiting disclosure of the alter ego discovery responses to the parties in this litigation, their attorneys, their experts, and others involved in the litigation (the court and its staff, court reporters, etc.) and limiting the use of the alter ego documents to this litigation will sufficiently protect the Gunther Parties' privacy interest in the information. The court rejects the Gunther Parties' request for an *in camera* review or neutral third-party review as unnecessary. Additionally, the court rejects the Gunther Parties' request for a staggered approach to the alter ego discovery. This case has been pending since 2016. The parties and this court cannot afford the delay that would be caused by such an approach. Similarly, the court declines the Gunther Parties' request that production be stayed pending resolution of their forthcoming motion for summary judgment. There is no telling when that motion will be resolved and this case must not be held up further. Additionally, it is clear that Mack and Red Stick will defend the motion for summary judgment in part by arguing that they

need this very discovery, and as stated above, the court has found that the discovery is relevant to the alter ego claims and proportional to the needs of the case.

## Conclusion

For the foregoing reasons, as to the remaining issues raised by the Motion to Compel (Rec. Doc. 177), the Motion is GRANTED. The Gunther Parties shall supplement their discovery responses as requested by Mack, except as to the category 1, which requests are narrowed to documents reflecting (a) the owner's investments and (b) any funds transferred between the owner and the entity. The Gunther Parties may produce their responses pursuant to a protective order limiting their use and disclosure. The parties shall work together to negotiate an agreed protective order and shall submit it to the court by motion for approval. The supplementation of discovery responses shall be made within 21 days.

New Orleans, Louisiana, this 26th day of July, 2019.

_____
Janis van Meerveld
United States Magistrate Judge